318-069 Sandra Lawson, appointed by Michael Huesman v. Anthony Iaderosa Jr. Jennifer Housdall Iaderosa, athletes by Michael Cullman Thank you. Mr. Huesman? Good morning. Good morning. Good morning. May it please the court, counsel. My name is Mike Huesman. I represent the plaintiff, Sandra Lawson. We're here today appealing the trial court's dismissal of counts one through seven of our second amended complaint. Ms. Lawson brought counts one through seven under the Loss Recovery Act to recover the gambling losses of John Webb from a group of defendants that we have been referring to throughout this litigation as the Iaderosa defendants. Lawson's second amended complaint alleged that the Iaderosa defendants were the bookmakers and the winners of the wagers at issue here. The Iaderosa defendants moved to dismiss and they raised other affirmative matters under 619A9 that they argued should defeat those claims. The trial court granted their motion to dismiss on at least two grounds and there's a question about the third basis for dismissal because the record on that issue is not clear. Sandra Lawson is John Webb's mother. One of the issues in this case, in dismissing counts one through seven, the trial court found that Lawson and Webb had conspired to bring this lawsuit in violation of Kaiser v. Walden in order to pursue treble damages under the Loss Recovery Act. Second, the trial court found that a prior lawsuit that John Webb had filed in Florida against the Iaderosa defendants was an attempt to recover the same gambling losses at issue in this case. Under the Loss Recovery Act, when a third party brings suit to recover someone else's losses, it's a prerequisite that the loser cannot have already pursued his remedy for himself. The circuit court in this case found that the Florida litigation was an attempt by John Webb to pursue his own remedy under the Act. We think that the court erred on both of those decisions. Lastly, there's a question as to whether the trial court accepted the defendants' judicial estoppel arguments that they raised in this motion to dismiss. In the event that this court thinks that it did, that decision was also in error. Moving on to the first issue, the Florida litigation was not an attempt by John Webb to recover the gambling losses at issue in this case or to recover any gambling losses at all. The Florida litigation arose out of a very specific incident that was detailed in both the Florida amended complaint and the Florida second amended complaint. The entire dispute between John Webb on one side and the Ida Rosa defendants on the other side was when Mr. Ida Rosa, Anthony Ida Rosa Jr., sent a package to John Webb via FedEx that was supposed to contain $156,000 in gambling winnings that Webb had won and that the bookie was paying to him. This was on January 20th of 2016. The very next day, John Webb won another $360,000 from Ida Rosa. At that point, Ida Rosa recalled that first FedEx package before it was delivered to Webb. He texted John Webb that day and said, I apologize. I sent the wrong package. I've recalled it. I'm going to send you the correct package. Don't worry about it, essentially. He never did that. He never sent any more money to John Webb. After a short period of time, it became apparent to Webb that he was not going to get the first $156,000. He wasn't going to get the next $360,000 that he won the next day. At that point, John Webb essentially said, okay, I'm finished. I'm not betting with this guy anymore. At that point, he requested the return of the money that he had still on deposit with this website. When John Webb would go on to make bets, it was through a website. He had what was supposed to be an escrow account with his money on deposit. He said, give me all my money back. We're done here. There was $646,000 supposed to have still been on deposit and supposed to have been held in an escrow account. That money was not returned to John Webb either. Then the Florida litigation arises. The Florida litigation concerned only that money that was supposed to have been held on deposit. That had never been wagered. It hadn't been won. It hadn't been lost. It also hadn't been returned to John Webb when he said we're through here. Webb has always maintained in Florida and the Florida pleadings, I should say, maintained that there was approximately the $1.2 million owed to Webb down there. It was the $516,000 that he had won over that two-day period. It was the $646,000 that was supposed to have been held in escrow that was essentially stolen from him by Mr. Iadarosa. The Florida litigation only concerned that $646,000. They didn't sue for the winnings. Mr. Webb was represented by competent counsel in Florida who realized going in that you can't sue to enforce a gambling contract and that the court was not going to make the bookie pay the winnings. They were going after the deposits that Iadarosa stole when the gambling stopped. If you look at the counts pleaded in the Florida complaints, they all relate to the stolen escrow count. Fraud, civil theft, conversion, unjust enrichment, et cetera. The defendants here argue that Webb was, quote, in effect, close quote, pursuing his gambling losses. That's just simply not the case, and they ignore that Webb was ahead of Iadarosa at that time. He was up on him by $516,000. There's nothing in the pleadings in Florida that even remotely suggests that he was pursuing his losses. That didn't even occur to anyone down there. It was he was ahead of him. If anything, he would have been going after his wins. Which brings me in to my next point that loss in this case should not be judicially estopped based on the allegations that another person, John Webb, made in Florida. Now, this is the issue that we did not raise in our opening brief. It was raised in the response, and that's because I don't believe the circuit court's ruling on this issue was correct. It was clear. If you look at the transcript of the proceedings from the hearing on the motion to dismiss, the circuit court said, quote, and I think Kaiser is on point. At this point, the circuit court is talking about Lawson's standing to sue because she's the mother of Webb. And the court says, quote, and I think Kaiser is on point. I believe judicial estoppel is on that issue is not only relevant but is controlling, close quote. That was the only mention of judicial estoppel in the trial court's ruling. And with the court citing Kaiser in that very same sentence there, it wasn't clear from the ruling that the court had accepted all these judicial estoppel arguments that had been raised by the defendants. Nonetheless, they did fully brief, the defendants did fully brief that issue in their response. I addressed it in our reply. So the defendants will, of course, argue that we've waived that issue and that we forfeited our right to argue this point. That, however, is not the case simply due to the fact that they did get a chance to fully brief the issue. No one's been caught by surprise here. And we do cite the Hines case, 28-03-976, for the proposition that this court can consider an issue that was not raised in our opening brief if the circumstances so justify. And this is one of those cases. So getting to that, to the issue, their argument is that Webb essentially admitted in Florida that he never gambled with Idarosa. So, therefore, how can Sandra Lawson come in to pursue his losses if he's already admitted he never gambled? He certainly did not admit that he never gambled with Idarosa. The arguments in Florida, the allegations in Florida were that the FedEx package went out on January 20th, 2016, $516,000. The very next day, January 21 of 2016, there was another win for $360,000. In our case, in Will County, Sandra Lawson attached a spreadsheet to her pleadings that contained a chart of Webb's gambling winnings and his losses. That chart, the last wager on that chart was January 23 of 2016. Two days after he won the $360,000 and when it was apparent through these text messages that this money was not ever going to be paid to him. So at that point, he stopped betting. So the argument in Florida that no gambling occurred was with respect to this $646,000 in deposits that were sitting there that had never been bet. They hadn't been won. They hadn't been lost. They were stolen by Mr. Idarosa. Just because no gambling ever occurred with that money that was sitting there in the account doesn't mean that no gambling ever took place at any point between those two individuals. The Florida lawsuit concerned a very brief snapshot in time. It was essentially these few days in January of 2016. Our case here today by Ms. Lawson goes back five years. We're pursuing five years of gambling losses of John Webb's. Can I just stop you for a moment? Sure. But you said at the time the relationship ended, Webb was up. He had won. He was up, as you said. Money was supposed to have been sent. He was up. So how is that a loss under the Illinois sketch? Well, there's two responses to that, Your Honor. A, there's a theory that the Loss Recovery Act doesn't say you have to credit the wins. That's not an issue before this Court. You said he was up. Well, he was up. There was a package that was whether he's up over the long run and has a net win or loss is a different issue than waiting for a check to arrive in the mail and I'm up as of today. I guess I don't know the Florida pleadings and the record's not clear whether he was up since the beginning of his relationship with Ida Rosa. I may have misunderstood what you said then. Okay. Because I thought that you represented to this Court he was up when the relationship ended. What I meant by that, Your Honor, was that he was waiting for a check to arrive. He wasn't sending money to Ida Rosa at that point. The Florida pleadings are this three or four-day period in January. At that point, he was waiting for money to arrive. He wasn't paying money in. We don't know. The record doesn't indicate what happened five years ago. I think I understand your point on that. Okay. Sure, I agree. Okay. Why didn't he file this suit? This lawsuit in Will County was filed in March of 2017. No, why didn't he file it? Oh, he did not. Seven counts. Right. Because the timeline had expired. Under the Lost Recovery Act, he has a six-month statute. And by the time he realized the existence of this statute, quite frankly, that timeline had long since passed. Okay. This is an anachronistic law. I would agree with that just based on the research we've all been trying to do to get caught up to speed on it. It's hard to understand why it's still on the books. So to get ‑‑ there's another argument. So with respect to the judicial estoppel arguments raised by the defendants here, they will, of course ‑‑ they have argued that Webb has admitted he never gambled. The other theory that is in the Florida pleadings is that although it appeared gambling was taking place, Webb argued in Florida that it was never a bet if the bookie never intended to pay him if he won. If I place a bet for $1,000 and the bookie never intends to pay me if I win, that's not a bet if the party has no money at risk. Thank you. What Mr. Idarosa was doing, he was holding himself out as a bookmaker, but he was simply stealing money. They didn't meet their burden. They didn't meet the elements under Seymour v. Collins for judicial estoppel to apply. The next argument that the circuit court relied upon in dismissing the case was that Webb and Lawson had somehow conspired to bring this case. And they relied ‑‑ the circuit court had relied on the Kaiser and the Stanninger cases. The defendant's argument under 619A9 was simply that Webb, Lawson is the mother of Webb. That's it. That's the only argument that had been raised. Out of that, the court found a conspiracy along the lines of Kaiser. And in Kaiser and in Stanninger, both of those cases dealt with fact situations where the parties were aware of this six‑month statute before it had expired. And there was potentially a conspiracy to wait out that time period simply to file suit for treble damages. That's not what we have here. That's not anywhere in the record. It's certainly not apparent from the face of the pleading attack. They didn't offer any evidence of that such. Those cases talk about lying in wait for the deadline to expire so you can pounce on somebody and sue for treble damages. There's no evidence whatsoever that Webb or Lawson was ever even aware this statute existed until long after the six‑month deadline had expired. Lastly, both sides did cite to the Dubecker case that's currently pending before the Illinois Supreme Court. I want to briefly finish on how that case is distinguishable. I've already talked this morning about the text messages between Ida Rosa and Webb when the money was supposed to have been sent to Webb. These individuals were very familiar with each other. Webb had been sending money to Ida Rosa's home address. These packages were being signed for by Jennifer Pelsil Ida Rosa, the wife of Anthony Ida Rosa, Jr. They mailed documents to their home addresses. They sent each other text messages. That's not the situation that was addressed in the Dubecker case where there was a daily fantasy sports website that allowed complete strangers to match up randomly through this website. The website at issue in our case was simply a medium through which the veteran contacted his bookie. It was like picking up the phone. And the vets were placed directly with Mr. Ida Rosa on one side and Mr. Webb on the other side. Thank you. Thank you, Your Honors. Thank you. Mr. Cohen. May I please have the court. Counsel. Your Honors, this lawsuit constitutes John Webb's second attempt to try to recover what he alleges were his gambling losses to what I'll refer to as the Ida Rosa defendants. Justice Wright, you asked a question of counsel. Was he up by the end of all of this? I didn't ask it. He said it and I asked what he meant. Yes, Your Honor. And we have performed that analysis because in the. Is it in the record? It is in the record, Your Honor. Attached to the lawsuit in Will County was a spreadsheet detailing all of the alleged wins and losses between Mr. Webb and my clients. And there was no sum at the end. But if you spend the time to add them up, which we did, the total was allegedly $4.9 million in wins by Mr. Webb and $4.3 million in losses. So that's a $600,000 differential in favor of Mr. Webb. So that brings me to the statute. My analysis has to start with the statute. And in paragraph B, it says that you can initiate a civil action against the winner. Well, your clients are not winners. Well, Your Honor, I would agree with you. Overall, Mr. Webb was the winner of the series of wagers that allegedly occurred between Mr. Webb and my clients. So for that reason. So you're, on behalf of your client, are stating that, in fact, the $4.9 million overall was paid, that the transfers were actually made, and the money was sent from your client to Mr. Webb, and the transactions were completed. No, Your Honor, I'm not stating that at all. This was dismissed on the pleadings. This is merely based upon. But what you're saying is that you did the math and you figured out, was he up? And up, in gambling terms, can mean, you know, I'm up for the day and go to the casino, but I'm not going to consider what I've lost in the last 20 years. Today, I'm up. You know, so, but what you're saying is that when you did the math, that your client was the loser, which would presume that there was actually money that changed hands. And so I'm asking you if all the money that was on the spreadsheet that the Webb say was won or owed, that it was actually paid. Well, Your Honor, I don't know the answer to that question. This is a, this was dismissed on a 619 motion. Isn't that one of the problems, that you're supposed to dispose, if it's easily answered questions of, or easily proved issues of fact or law? And we have a lot of things that are very unanswered and not very clear here, don't we? Well, Your Honor, we were entitled to, we were required to take Mr. Webb and Ms. Lawson's well-plaid allegations as true. One of the allegations we do take as true, and that I'm discussing with Your Honors, is their allegation of the amount that was allegedly won and the amount that was allegedly lost. However, the case in the dismissal did not turn upon the, whether my clients allegedly won more than they lost. The court ruled on several bases in dismissing the case with the Lost Recovery Act claims with prejudice. To be clear, Mr. Webb's act, cause of action, continue in the court below. So the first basis on which the court dismissed Ms. Lawson's Lost Recovery Act claims, was that Mr. Webb attempted to recover his alleged losses in the Florida action. The Lost Recovery, Section B of the Lost Recovery Act states that if within six months, such person who under the terms of subsection 28-8A is entitled to initiate action to recover his losses, does not in fact pursue his remedy, any person may initiate a civil action against the winner. So if Mr. Webb sought to recover his gambling losses in another lawsuit, Ms. Lawson would lack standing to file suit under the Lost Recovery Act. Now, Ms. Lawson claims that Mr. Webb did not attempt to recover his gambling losses in the Florida litigation, but that is simply untrue. If you look at the allegations of the Florida complaint, and specifically I'm referring to the amended complaint in Florida, Mr. Webb tried to walk a fine legal line. What he did was allege that he thought he was wagering with my clients, but then in fact he wasn't, that no money was put at risk, that instead my clients were allegedly perpetrating a type of Ponzi scheme where they were taking his money, not betting it, not wagering it, but instead using it to pay other winners. And there were specific allegations that the defendants never placed his wages because there was no money ever put at risk. In that lawsuit, Webb made clear that he was not seeking his winnings as damages, but rather, and I'm quoting here, all the monetary deposits that the defendants received which Webb thought was being used to bet or wager. That's paragraphs 171 and 172 of the Florida amended complaint. This would, of course, necessarily include any and all deposits which Webb thought he had lost because the only way you can wager in gambling is to make deposits and wager them, and then if you lose, your deposits are no longer yours. So Webb was attempting to obtain all of his gambling losses, although he called them lost deposits instead. Now, I think it's interesting to note that in the Will County lawsuit, Webb continues to seek his gambling losses. In paragraphs 152 and 153 of the second amended complaint, alleges that as a result of the defendant's, my client's alleged misrepresentations, Webb incurred gambling losses in excess of $50,000. So Webb continues to seek his gambling losses through the Will County lawsuit. He seeks those through a fraud theory, not under the Loss Recovery Act. Now, Lawson argues that because Webb's claims in the Florida litigation were under the common law, that he could not have pursued his remedy within the meaning of the Loss Recovery Act. But this is not a tenable construction of the Loss Recovery Act. If Lawson's correct, then even if Webb had succeeded in suing to recover his alleged gambling losses, in the Florida litigation or, indeed, in any other litigation, including litigation in this lawsuit, Lawson could still recover treble damages. That is not a reasonable construction of this statute and could not have been the intent of the legislature. The court has to presume that the legislature did not intend an absurd result such as that. Because, and further, because Section B of the Loss Recovery Act is penal in nature, it must be strictly construed. So reading the Loss Recovery Act as a whole and strictly construing it against absurd results, any attempt by Webb to recover his alleged losses deprived any third party, including plaintiff Lawson, from standing under Section B of the Loss Recovery Act. So that was the first basis on which the court dismissed Lawson's Loss Recovery Act claims. The second basis was the relationship between Lawson and Webb. Illinois courts have long held that the legislature did not intend for alleged gambling losers to refrain from exercising their right to recovery or their alleged right to recovery in favor of a family member or some other person obtaining treble damages. In 1902, the court, the Supreme Court in Kaiser v. I doubt both Kaiser and Stanager stand for the proposition that you get the opportunity to try and prove the conspiracy, not that the relationship itself is proof of a conspiracy. That is generally correct, Your Honor. However, this case, the unique facts of this case, present on the face of the pleadings the existence of a conspiracy. Kaiser and Walden did not involve, as is the case here, an alleged gambling loser trying to file suit in another state. And then once they didn't succeed, going to Illinois and filing suit as court plaintiffs with their mother, represented by the same attorney, both seeking to recover gambling losses. I've never seen a case, and I've looked, I've never seen a case like that in this state. I've never seen a case like that in the country. The court rightly reviewed those facts and determined that there was no material question of fact as to whether a secret arrangement existed or any arrangement existed between Lawson and Webb. And that's how the court in 1908 in Mitchell v. Nelson referred to the touchstone of Stanager and Kaiser, a secret arrangement. The court was correct in determining that. Now, Lawson argues that if Webb was unaware of the Loss Recovery Act's existence, and he argues that counsel argued that Mr. Webb was not aware of the Loss Recovery Act's existence, then that somehow obviates a conspiracy. However, the Illinois Supreme Court has repeatedly held that all persons are presumed to know the law. So I don't think that as a matter of law we were required to prove that Mr. Webb knew of the Loss Recovery Act. He's presumed to know of the existence of the Loss Recovery Act. So because of, again, the unique facts of this case, the fact that they're co-plaintiffs, Lawson and Webb are co-plaintiffs in the same lawsuit, both seeking to recover in the Loss Recovery Act, the court was correct in dismissing this on a 619 motion. Now, the next basis for dismissal was the judicial estoppel argument that we made in our briefs before the trial court. Now, the court was clear, the court did use the terms judicial estoppel and effectively granted dismissal on the basis of every argument we made in our motion to dismiss. I think that we have to presume that the court did not mistake its basis for ruling, and in any event, the same review here is de novo. So, again, our argument is that by not presenting this as an issue for review in their opening brief, counsel and Ms. Lawson did waive this argument, and the court can affirm on the basis of judicial estoppel alone. However, even if that's not the case, again, the review is de novo and the court can consider the argument. Now, judicial estoppel is relevant here because for Lawson's Loss Recovery Act claims to succeed, the defendants necessarily must have been the winners of allegedly illegal wagers. Now, Lawson's Loss Recovery Act claims are necessarily a derivative of Webb's right to have pursued his remedy, and she should be bound by the allegations to the extent that Webb would be bound by those allegations. Lawson, as a sensible independent third party, would have no primary knowledge of these wagers. Webb did. Webb should not be allowed, Lawson should not be allowed to contradict Webb. This, well, getting to the allegations itself in the Florida lawsuit, in his attempt to circumvent Florida law and recover what in effect were gambling losses, although he phrased them as gambling deposits, Webb alleged that he never gambled with the defendants but only attempted to place wagers and then only parimutuel wagers on horse races. In parimutuel wagers, the house, the website, the casino, takes a fee but is not the winning counterparty. And we've cited cases in our brief that dictate that if there's parimutuel wagers are not recoverable under the Loss Recovery Act. Lawson argues that Webb never alleged that he wagered, but I ask your honors to look at paragraph 164, for example, of the Florida amended complaint, where Webb alleges no bets or wagers with Ida Rosa ever happened. But isn't that allegation in what he's saying is that, well, he sent the money, that they didn't place the bets as agreed, they kept the money, and they were actually conducting a Ponzi scheme. Correct, your honor. He said that he alleged that he only attempted to place wagers, parimutuel wagers on horse races, but that those wagers never occurred and that neither party ever had any money at risk. That's diametrically opposite to his and Lawson's allegations in the Will County case, which necessarily alleged to recover under the Loss Recovery Act that the wagers actually did take place. Money was put at risk. So this cuts to the harder judicial estoppel. While judicial estoppel generally requires that Webb have succeeded in some part, the Supreme Court of Illinois has repeatedly stated that judicial estoppel is not reducible to a PAC formula and that it's a flexible doctrine. There have been multiple cases that have not required success as an element of judicial estoppel. That's the Patriot Sinema's case from the First Circuit and the AFN Incorporated versus Schlott case from a federal court in New Jersey. So we think that this cuts to the heart of judicial estoppel and that Lawson should be judicially estopped from proceeding with her claims here. The last basis that we argue in our brief is the Dubecker case, which was not decided at the time Judge Rossi ruled, but has subsequently been decided as now on being decided by the Illinois Supreme Court. In that case, the Court noted that the Lost Recovery Act is limited by its terms to a person-to-person wager, which requires a direct connection between the two persons involved in the wager. In Dubecker itself, the two persons alleged to have been gambling actually did know each other, but the Court focused on modality of the betting, not whether the persons actually knew each other, and surmised that using a modality where people potentially do not know each other is not a person-to-person wager, could flood the state with lawsuits and refuse to construe the Lost Recovery Act in that way, which it labeled as absurd. The situation here is analytically indistinguishable from Dubecker. While Lawson alleges that Webb was betting directly— Can I back you up? Sorry. Of course. I'm not a gambler. I'm not really familiar with how it works. If I go to a racetrack and I put $2 down, I'm betting directly with the racetrack, aren't I? That would be correct, Your Honor. In this situation, the money, the $2, the $2 million is being sent for the middleman to place the bet. So you're not correct? Well, Your Honor— Is that the way it works? Well, vis-à-vis horse racing, I'm not exactly sure. Okay. But the difference seems to me to be that you go to a track and you know who you're gambling with. The track. The track is owned by certain people. You can look it up who you're— Let's say riverboats. Sure. Riverboats here where people gamble and they sit down at the table and they sort of wager out. They're betting with the house. Well, Your Honor, if they're playing poker, for instance, they're not betting with the house. They're betting with the other people at their table. But it's still a direct wager. Correct. Here there's a third party in the middle. Am I correct? Well, Your Honor, there's a website in the middle which is a faceless entity. You don't know when you're betting via an Internet website who you're gambling with, and that cuts to the heart of the Dew-Becker decision. Unlike a poker table, it's a person-to-person wager. You're looking that person in the eyes. You're familiar with who you're betting with. There is a potential that if you're betting using an Internet gambling website, you would have, under the Lust Recovery Act, the right to sue if you're the loser. All of these faceless people that are operating the website, or if you're engaging in parimutuel wagers, the counterparty to those wagers. You are not familiar necessarily with the identity of those people, and that is the basis on which the Dew-Becker decision turned. Thank you. That helps me. Yes, Your Honor. I do understand it's a bit one has to have more than basic knowledge of gambling in order to understand the mechanics of this Lust Recovery Act. I appreciate you answering that. And, Justice McDade, I think you're right that this is a very anachronistic statute. Justice Posner, in the Sonnenberg case, commented at length upon how this statute stemmed from an era of moral repugnancy to gambling, which is simply not the case anymore. There is now going to be legalized sportsbook betting in Illinois. For all these reasons, the Lust Recovery Act, in addition to the fact that it is a penal statute, should be strictly construed against its application. And I think here the circuit court rightly found that, given the history of litigation between Mr. Webb and my clients, the allegations in the Florida lawsuit that this was something that did not need to go to discovery, that the deficiencies in Ms. Lawson's cause of action is patent, was patent on the face of the complaint and based upon the public record. And I just want to note that the Court refused to dismiss Mr. Webb's claims, which continue in the circuit court. Mr. Webb is continuing to try to recover his alleged deposits and, in fact, his alleged gambling losses through fraud and conversion claims. When you say circuit court, you're referring to the circuit court in Florida, not the circuit court in Will County. Will County. His claims are alive, and it may be that we'll be back here again on those, because we believe that the circuit court was wrong in letting those games continue. So for all those reasons, we would— I think the Lust Recovery Act has been pretty recently amended by the general assembly, hasn't it? You know, Your Honor, I reviewed that. When the Sports Waivering Act, I believe it's called, was put into law, I do not believe the Lust Recovery Act was amended. At least, I believe it was amended to incorporate certain of the now legal modalities of betting, but the kernel, the basic cause of action in the Lust Recovery Act remains the same. Right. So in recent times, the general assembly has reviewed this and has decided to let it remain as good law, and something, whether we agree or disagree, is still an available remedy for people. This is true, Your Honor. The legislature, for better or for worse, has not yet done away with the Lust Recovery Act. But the courts have severely limited, based upon the plain language of the act, limited its application to person-to-person wagers, such as if you're sitting across a poker table from somebody. That is not the case here. Again, this is using a faceless website to—a modality to engage in the gambling. And the case, the court in the First District in Duke-Becker, has ruled that that is not the intent of—that was not the intent of the legislature in passing the Lust Recovery Act, and I presume allowing it to continue, choosing not to amend it. Did I hear you state that the Duke-Becker case is now going up to the Illinois Supreme Court, or did I mishear you? That's correct, Your Honor. I believe oral argument may have occurred last week or two weeks ago. Thank you. Thank you, Your Honors. Thank you, Mr. Poehler. Mr. Hoosman, rebuttal. Thank you, Your Honors. Counsel stated earlier that all of Webb's wins and losses were contained on this spreadsheet that was attached to the Will County pleadings. That was certainly not the case. The original complaint filed in Will County generally alleged damages in excess of $50,000. There wasn't specific wagers itemized. There was a statute of limitations defense raised by the defendants, and that was at issue in this last motion to dismiss. It was a 615 argument that was never addressed because the case was dismissed on 619. At the end of the motion to dismiss the original complaint, the judge said, give me some more information. The judge said that each wager was a specific transaction, so I could theoretically be up overall and still pursue my losses under this act. So what the amended and second amended complaints do is they contain a brief snapshot in time, and they both specifically say that Webb's losses included but were not limited to the following wagers, which were a brief snapshot in time contained on this spreadsheet. That spreadsheet does show a net win at the end of it, but that is not material for today's analysis or it wouldn't have been material at the trial court level either. Each wager itself is a specific transaction, which could be the subject of a lawsuit under the Loss Recovery Act. In dealing and then moving on to the Duebecker case, counsel argued repeatedly that this here was simply a faceless website and it was very analogous to the Duebecker website where you're placing bets through a faceless website, you don't know who's on the other end. That's not the case. We've talked this morning about the text messages between the parties, the principals. The amended complaint details with specificity how Ida Rosa controlled this website. There was packages with specific dollar amounts, not $35,000, but, for instance, 35 and some odd dollars that were mailed directly to Anthony Ida Rosa's home. His wife signed for the package. The next day, that exact dollar amount appears in Mr. Webb's online account with the website. This was not a faceless website that you could go on and just randomly make wagers with. It was operated and controlled by the Ida Rosa defendants. Getting back to what I talked about earlier with respect to each wager being a separate transaction and the court's request that we specifically itemize these wagers, that was in the hearing on the motion to dismiss the original complaint, but that transcript is in the record on appeal. There's three transcripts in this record, the original hearing on the motion to dismiss the original complaint, the hearing on the motion to dismiss the first amended complaint, and the second amended complaint. The reason those are all included in the record is because the 619 motions that were granted with respect to the second amended complaint were denied two times prior. The original complaint was dismissed under 615. We replayed the specificity, the dates and the times and the amounts of the wagers. The first amended complaint was dismissed under 615. The 619 motions were denied. And now the second amended complaint is when the court dismissed under 619A9. Due to that inconsistency and the court possibly being right the first two times, is why we included all three transcripts in the appellate record. So for those reasons, we are asking that the circuit court be reversed and that we are allowed to proceed on Lawson's claims in the trial court. Thank you. And one quick point, if my colleagues will indulge me because it's getting very close to our afternoon call. First, I want to thank you for including the statute in your brief. That's always really helpful. Can you help me understand why this wasn't a faceless wager or wagers individually? Right. Is it fair to say that these are bets on sports games or teams? Correct. Okay. So why do you say it's not faceless? Well, the Dubecker court held that the Lost Recovery Act was intended to apply to allow recovery when two people who know each other or are at least familiar with another's identity engage in illegal gambling. This was not a... Okay. So that's your point that the money is sent to somebody he knows? Yes. It was sent to the home address of the bookie and then it appears in the website. It's not a faceless website that we don't know who's behind it and how this all works. Okay. Thank you. Thank you. We thank both of you for your arguments this morning and afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will stand in hearing.